AMERICAN OAK LEATHER CO. v. C. H. FARGO & CO. et al.

(Circuit Court, N. D. Illinois. November 30, 1896.)

CORPORATIONS—FRAUDULENT PREFERENCES.

· A corporation, when in fact insolvent, executed to three of its creditors judgment notes for the amount of their claims and for certain future advances, and, to secure them from the possibility of future preferences being given other creditors, the officers and a majority of the directors of the corporation resigned, and their places were filled by the election of members of the preferred creditors' counsel. The corporation continued business, apparently under the old management, until forced to suspend. *Held*, that the arrangement had the effect of a secret mortgage, with possession and power of sale remaining in the mortgagor, and was therefore fraudulent in law, though no actual fraud was shown.

Newman, Northrup & Levinson and Smith, Helmer, Moulton & Price, for unsecured creditors.

Isham, Lincoln & Beale, for secured creditors.

Hoyne, Follansbee & O'Connor, for Metropolitan Nat. Bank.

Cratty Bros., Gray, MacLaren, Jarvis & Cleveland, for C. H. Fargo & Co.

GROSSCUP, District Judge. The motion under consideration is for a receiver for the funds now in the hands of the marshal, resulting from a judicial sale of the effects of C. H. Fargo & Co., a corporation under the laws of Illinois, and for the book accounts and other assets assigned by the corporation. The funds realized from the sale and assignments are not more than sufficient to meet the judgments obtained by L. Candee & Co., the Metropolitan National Bank, and the United States Rubber Company,—judgments obtained upon notes confessedly made in preference to the other creditors of C. H. Fargo & Co., and defended now as a justifiable and lawful preference. If this contention be sustained by the court, the motion for a receiver must fail, for there is nothing for him to take. If the contention, however, be overruled, the motion ought to prevail, in order to a distribution of the assets equitably among the creditors.

The corporation of C. H. Fargo & Co., organized in 1889, as successor to the co-partnership of C. H. Fargo, was essentially a family affair. The stock was owned by Charles H. Fargo, his sons, and a brother or nephew; and of the seven directors five were Fargos, and the remaining two employés of the corporation. The corporation got into financial difficulties as early as 1893, but managed to get along without executing any mortgages, judgment notes, or other instruments in the way of preference, until about the beginning of the year 1896. Even then the Fargos unquestionably regarded themselves as solvent, and believed that time and the indulgence of their creditors would enable them to survive. But, as is now apparent, they were then hopelessly insolvent. About the 1st of January, 1896, times growing no better, the Fargos called to their assistance the United States Rubber Company, to whom they satisfactorily showed that, unless help to the extent of $50,000 was forthcoming, the house must fail. Their indebtedness at this time to the United States Rubber Company was about $180,000; another large amount, but not so large, to L. Candee & Co.; a considerable debt to the Metropolitan National Bank; and debts to creditors generally, amounting to a very large sum. This appeal to the rubber company resulted, after considerable negotiation, in the following arrangement: Judgment notes were executed to the rubber company and Candee & Co. for the amount of their claims, including the past as well as the forthcoming one of $50,000, and subsequently, just before the failure, a like note was given to the Metropolitan National Bank for its past claim, including some fresh advances of money. The Fargos promised to execute no other judgment notes, nor give in any form any other preference; and, in order to make this effectual, the president and secretary of the corporation and a majority of its directors resigned, whose places were filled by the election of gentlemen from the office of counsel for the rubber companies. Thus denuded of power, the Fargo corporation could thereafter make neither note, mortgage, nor assignment without the consent of the rubber companies, nor could any other creditor obtain either a preference or an equality with the already preferred creditors, without the rubber companies' consent.

During the period intervening between January 1st and August, when the judgments were taken and executions sued out, the Fargo Company pursued its ordinary occupation as a retailer of boots and shoes, all the business transactions being carried on by the Fargos personally, the money received going into the hands of the corporation as controlled by the Fargos. In the meantime the corporation purchased a large quantity of goods, upon which there is still unpaid some $75,000 or $80,000. Some of these goods are among the assets sold by the marshal, and are the basis of the claims of the intervening creditors moving for the receiver. In August an assignment of the corporation's plant at Dixon, said to be worth $25,000, was made to the Metropolitan National Bank, and an assignment of its notes and accounts was made to the rubber company, and judgments were obtained upon these judgment notes, upon which executions were taken out and levied upon all the remaining property.

I have no reason to believe that either the Fargos or the judgment creditors meditated any actual fraud upon the other creditors. The Fargos, with that hopefulness which actuates men in even failing business enterprises, and leads them to think that the day of embarrassments is almost over, doubtless believed that this help from the rubber companies would enable them to go on to the advantage of all their creditors; and the rubber companies doubtless shared in that belief. If this were a case where actual fraud, or intent to defraud, must be proved against the parties concerned, it might at this point be dismissed.

But the question recurs, was the arrangement, in itself, a fraud in law? If so, the preference must be set aside, irrespective of the actual intentions of the parties. A business man's pecuniary circumstances and ability to pay his debts are generally judged by the tangible things he has in sight, and the accounts or choses in action he can disclose. Upon these evidences of prosperity credit is ordinarily advanced. This was so true in the earlier days of trading that the common law permitted no lien, either by way of pledge or chattel mortgage, upon personal property, unless it was accompanied by the transfer of possession to the party holding the lien. As trade advanced, however, it became necessary that personal property should be susceptible of becoming security for debts or advances, while still remaining in the possession of its owner, the debtor; and hence statutes were passed permitting such liens, where proper registration of the fact was made, so that the world could obtain notice of the exact amount and nature of the burden such property was carrying. Thereafter, persons contemplating credit or advances upon the confidence of the personal property in sight were expected, by good business considerations, to inquire what burdens were publicly recorded against it. But these statutes did not dispel the reason upon which the common-law prohibition was founded, nor dissolve that prohibition, except to the extent plainly intended by the statutes. The personal property in the possession of a merchant still remains the basis of his credit, and any device, however rightfully intended, which might enable a dishonest trader to shield himself against his creditors, or to hinder and delay them, is still for-

bidden by the policy of the law. The doctrine in the federal courts is based upon Robinson v. Elliott, 22 Wall. 513, in which the supreme court held that a mortgage of a stock of goods, permitting the mortgagor to retain possession and sell from the stock, without accounting to the mortgagee dollar for dollar for the proceeds of such sale, was, in law, a fraud. The court, through Justice Davis, speaking of this mortgage, said:

"Whatever may have been the motive which actuated the parties to this instrument, it is manifest that the necessary result of what they did do was to allow the mortgagors, under cover of the mortgage, to sell the goods as their own, and appropriate the proceeds to their own purposes; and this, too, for an indefinite length of time. A mortgage which, in its very terms, contemplates such results, besides being no security to the mortgagees, operates in a most effectual manner to ward off other creditors; and where the instrument on its face shows that the legal effect of it is to delay creditors, the law imputes to it a fraudulent purpose."

I can see no substantial distinction between the reasons which influenced the judgment in that case, and those that ought to dominate the ruling in the case at bar. The salient features of the arrangement between the Fargo corporation and the creditors here claiming preference were as follows: (1) The giving of judgment notes, which, in itself, was lawful; (2) the transfer of corporate power to representatives of these creditors, thus effectually barring the giving of like judgment notes or other instruments of preference to other creditors; (3) the leaving of actual possession in the Fargos, personally, with power to sell and appropriate the proceeds, no arrangement having been made that the proceeds should be applied to the cancellation of the judgment notes; (4) the evident, and, in fact, confessed, motive of all this being not so much to secure a payment of the judgment notes at a definite time as to erect a barrier generally against other creditors, during the indefinite period allowed to the Fargos to tide over their business troubles. Though different in form, I can see no difference in substance between the arrangement under consideration and that of a secret mortgage with possession remaining in the mortgagor, under cover of which they sell the goods, and appropriate the proceeds to their own purposes; and that, too, for an indefinite length of time. The holders of the judgment notes, reinforced with their control of the corporate power, asked no accounting of the sales from time to time, and no application of their proceeds pro tanto upon the debt, and, evidently, would have indefinitely postponed the collection of the notes if the Fargos' circumstances had gone on prosperously.

The arrangement was not intended to provide means to pay the debt, but solely to provide a legal equipment whereby the entire assets could be quickly seized in case of disaster, and other creditors be prevented from obtaining a like advantage. Had the Fargos been dishonest, they could, under this arrangement, have appropriated to themselves the proceeds of the sales, and left to the holders of these preferential judgment notes, when the catastrophe happened, only the stock unsold, and, during the period of such dishonest appropriation, have effectually foreclosed other creditors by their arrangement with the rubber companies. It is not enough to say that such a

thing did not, in fact, happen, and that the Fargos were not, in fact, dishonest. The point is, did the rubber companies make such a dishonest appropriation an easy and natural opportunity to the debtor? If so, the transaction is, in law, a fraud. The law looks beyond the specific instance under review to the example such an instance suggests to the trading world, and to the frauds that might cover themselves under the opportunities of such an example. The arrangement under consideration is, in its practical aspects, an effectual, secret lien upon a stock of goods in trade, under circumstances that justify the trading world in giving security to the trader to which he is not entitled, and is, therefore, a much stronger case even than Robinson v. Elliott. In that case there was notice of the lien by registration, but a notice not as broad as the purposes and opportunities of the lien. In the case at bar, there was no notice whatever. The latter is, at least as much as. the former, obnoxious to the reasons which underlie the general common-law prohibition against liens that give debtors an opportunity to be dishonest.

While the policy of the law permits preferences, and such preferences as are necessarily unknown to others than those concerned, it does not permit any device which prevents the debtor from giving a like advantage to his other creditors, if he so wishes, unless such device is put in the form of a mortgage or other instrument perpetually open to inspection upon the public records. A policy of permissible preference thus circumscribed affords an equal opportunity to all. A credit advanced, with the sources of information always open to access, has no ground of complaint. But there is ground to complain if the debtor, without any public notice of that fact, has so situated himself legally that he cannot give like preferences to any one thereafter whom he may choose. Those who deal with him may apprehend his business embarrassment, and be conscious also of his right to make preferences, and still continue to deal even with business prudence, upon the belief that their own claims upon his friendship or his sense of justice will secure them against disadvantage. But, if the debtor be already securely mortgaged or tied up in an arrangement such as the one under consideration, there is left no field for the indulgence of such personal confidence. All reliance upon the personal quantity of the debtor is eliminated. The legal authorization of such a situation would not only be a practical fraud upon other creditors, but would effectually circumscribe the whole field of credit, and thus restrain and hamper trade. It would antiquate the laws relating to chattel mortgages, for no chattel mortgage would be spread upon the records where a secret lien or arrangement might be thus effectively enforced.

It is true the arrangement under consideration was not, in name, a chattel mortgage, nor a pledge of property. There is no name in the vocabulary of the law, so far as I know, exactly fitting it. It is an arrangement possible only to a corporation. An individual trader cannot so divide himself that one personality conducts the business and receives the proceeds, and another holds exclusively the reins of power. An individual can, by no arrangement except

a ·lawfully executed mortgage, debar himself from doing as he pleases with that which is his own, and acting as he pleases towards those to whom he is under obligations. With an individual, in contemplation of law, the right hand always knoweth what the left hand is doing. But here is presented a case where the actual personality of the trader is one intellect or set of intellects, and the power-holding personality another. The Fargos, in person, conduct the business, receive the proceeds, and appear to the world as the dominating will of the concern. The young men in the office of the favored creditors' counsel hold all the powers of action. The Fargos, in person, were the corporation of C. H. Fargo & Co., as the world knew and dealt with it, but were as helpless as their neighbor across the street, as the law technically knew and dealt with it. The device under consideration so cleverly dealt with the corporation that, while the personality of the Fargos stood out as the controlling power, and they in person would, in fact, have obtained the benefits of success, an invisible barrier in control of the favored creditors made them not only impregnable to attack, but helpless against appeal to their sense of justice by the other creditors. The device accomplished for the Fargos and the favored creditors all that a secret chattel mortgage, with possession and power of sale remaining in the mortgagor, could have accomplished, and must, therefore, be treated, in equity, as such a mortgage would be treated.

A debtor can prefer one or more of his creditors by the giving of judgment notes, without changing his personal aspect towards the stock in trade or the public at large, but in that event ·he must retain the power to do a like act of partiality or justice to others, if his mind so inclines; or, still retaining possession of the stock of goods, he can give a preference that will denude himself of all power to subsequently bring in others for an equal or better chance in the race, but in that event the preference must be publicly registered as a chattel mortgage; or he can give a preference by way of a fair sale or assignment, but in that event his possession of the stock of goods ends, and his attitude towards the trading world is changed. The device under consideration sought, through the peculiar opportunities that corporate adjustments afford, to obtain all the advantages of these several forms of preference, but without either a public registration of the fact, or the dispossession of the Fargos of the stock of goods. The judgment notes, themselves, would not have been a fraud in law. The assignment of the accounts, or of the plant at Dixon, would not themselves have been a fraud in law. But, connected, as they were, with the other advantages obtained, namely, deprivation of the Fargos of all further power, with permission to retain possession of the goods and reap the profits of their trade,—a scheme, on the whole, under which a dishonest trader could effectually shelter himself,—they are, in my judgment, within the plain prohibitions of the law.

The motion will therefore be granted, and a receiver may be appointed.