NATIONAL BANK OF COMMERCE IN DENVER v. ALLEN et al.

(Circuit Court of Appeals, Eighth Circuit. October 31, 1898.)

No. 1,037.

1. CORPORATIONS—POWERS—INDORSEMENT OF NOTES.

A corporation organized to carry on a mercantile business has power to indorse notes of a third person from whom it buys merchandise in payment for such merchandise.

2. SAME—LIABILITY OF ONE CORPORATION FOR ACTS OF ANOTHER—AGENCY.

Neither the fact that a bank held as collateral security a majority of the stock of a mercantile corporation, nor that one of its officers was for a time a director of the mercantile company, renders the latter the agent of the bank, so as to make the bank liable to creditors of the company for misrepresentations as to its financial condition made by its officers.

3. SAME—INSOLVENCY—POWER TO PREFER CREDITORS.

A private business corporation has the same power to prefer creditors as an individual, and, though insolvent, so long as it retains the custody and control of its property may dispose of the same so as to pay the claims of one or more of its creditors, to the total exclusion of other equally meritorious claims.

4. SAME—STOCKHOLDERS—RIGHT OF PLEDGOR TO VOTE.

Under 1 Mill's Ann. St. Colo. §§ 495, 496, which authorize persons holding stock in a corporation as trustees to vote the same, but provide that a pledgor may vote the stock pledged, one to whom stock has been transferred to hold as collateral security for an indebtedness to a third party is not a trustee, but the transaction is, in effect, a pledge, and, in the absence of express agreement, the pledgor is entitled to vote the stock.

5. SAME—PREFERENCE OF CREDITORS—UNDUE INFLUENCE.

A bank is not required to give notice of a claim against a mercantile corporation, or the amount of such claim, nor does the fact that it exercises the moral influence which it possesses over the company as a large creditor, to induce it to grant a preference, render it liable to other creditors for the amount received in payment of its claims, where it had no actual control over the action of the company.

6. JURISDICTION OF FEDERAL COURTS — INTERVENTION IN CREDITORS' SUIT—AMOUNT OF CLAIM.

Where a judgment creditor whose judgment exceeds $2,000 has filed a creditors' bill in a federal court in behalf of himself and all other creditors who desire to come in, to reach and subject a special fund alleged to have been acquired by a third party in fraud of the rights of the creditors of the judgment defendant, and the court has acquired jurisdiction over such fund, it has jurisdiction to entertain a petition of intervention by another creditor desiring to become a party to the bill, and claiming an interest in the fund, though the amount of his judgment is less than $2,000.

7. SAME—LIMITATION OF JUDICIARY ACT.

The provision of the judiciary act limiting the right to sue in a federal court to cases which involve $2,000, exclusive of interest and costs, does not apply to a case where a judgment creditor intervenes and becomes a party to a creditors' bill already filed by a judgment creditor whose judgment exceeds the jurisdictional amount, in behalf of himself and all other creditors similarly situated who desire to come in.

Appeal from the Circuit Court of the United States for the District of Colorado.

This was a creditors' bill, which was exhibited by George A. Allen and others, the appellees, composing the firm of Paris, Allen & Co., against the National Bank of Commerce in Denver, the appellant, and against the A. K. Clarke Mercantile Company, hereafter termed the "Mercantile Company." The bill was filed by Paris, Allen & Co., as judgment creditors of the Mercantile Company, for their own benefit, and for the benefit of such other

90 F.—35

judgment creditors of the Mercantile Company as might thereafter join in the proceeding and contribute to the expense thereof; whereupon several other judgment creditors of the Mercantile Company did unite in the proceedings and become parties complainant.

The relief sought is based upon grounds set forth in the bill of complaint, which may be summarized as follows: The Mercantile Company was organized on or about April 26, 1893, under the laws of the state of Colorado, for the ostensible purpose of acquiring and succeeding to the business of A. K. Clarke, who for some time previously had been engaged in the wholesale and retail liquor business in the city of Denver, Colo., which business was transacted in the name of A. K. Clarke & Co. The capital of the Mercantile Company was fixed at $200,000, consisting of 2,000 shares, of the par value of $100 each, and the stock was all issued to said Clarke and two other persons by him designated, as full-paid stock, in exchange for the stock of liquors, warehouse receipts, and other property formerly belonging to said Clarke. 1,998 shares of said stock were issued to Clarke personally, and 1 share each to two other persons, who forthwith became directors and officers of the corporation. Clarke was at the time indebted to the National Bank of Commerce in Denver, the appellant, in the sum of $50,000, and he forthwith assigned the 1,998 shares of stock in the Mercantile Company to said bank, as collateral security for his individual indebtedness. Immediately upon its organization the Mercantile Company engaged in the wholesale liquor business at the place formerly occupied by Clarke, and continued to transact such business until January 10, 1895, and in the meantime became indebted to the firm of Paris, Allen & Co., for liquors purchased, in the sum of $3,250, and to the other complainants as well, the total indebtedness aggregating about $20,000. The aforesaid indebtedness was contracted with the full knowledge of the National Bank of Commerce in Denver, hereafter termed the "Bank," which was acquainted with the purchases that were from time to time made by the Mercantile Company. Upon its organization the Mercantile Company guarantied and indorsed the individual obligations of said Clarke to the bank; doing so, as the bill alleged, without consideration, and for the purpose of creating a fictitious indebtedness from the Mercantile Company to the bank. On or about January 10, 1895, the Mercantile Company sold and transferred its property and assets to another corporation, called the "Colorado Mercantile Company," for the sum of $50,000, the whole of which sum, when received, was paid to the defendant bank. The complainants below further charged, on information and belief, that the Mercantile Company was organized for the purpose of enabling Clarke to avoid the payment of his individual debts, amounting at the time to $50,000; that the sale by the Mercantile Company to the Colorado Mercantile Company, in January, 1895, was made for the sole purpose of enabling the vendor to avoid the payment of its just debts, particularly the several debts due to the complainants, and for the purpose of hindering and delaying its creditors in the collection of their debts, and to secure the payment of the indebtedness due from Clarke individually to the bank; and that by the sale made by Clarke to the Clarke Mercantile Company, and by the assignment of Clarke's 1,998 shares of stock to the defendant bank, as collateral security, the bank became the sole owner of the property of the Mercantile Company, and conducted the wholesale liquor business in the name of the latter company, for its sole use and benefit, from April, 1893, until the sale in January, 1895, to the Colorado Mercantile Company. The complainants also charged that during the last-mentioned period the bank, acting in the name of the Clarke Mercantile Company, published to the commercial world that the stock of said company had been fully paid up by the sale and transfer of Clarke's stock of goods to said company; that the value of the property and assets of said company exceeded $115,000; that its debts did not exceed $10,000; that the foregoing statements were made for the purpose of deceiving persons who had dealings with the Mercantile Company, and to induce such persons to sell goods to said company; that thereby the complainants were in fact induced to sell goods to the Mercantile Company, shortly prior to the sale of its business to the Colorado Mercantile Company, which goods were on hand at the time of said sale; and that the proceeds thereof, on the occasion of such sale, were paid to and received by the defendant bank, and were still held by it. They further charged that the Mercantile Company

was at no time indebted to the bank in a sum exceeding $10,000. It was finally charged that the business aforesaid was conducted in the manner aforesaid,—that is to say, by the bank in the name of the Clarke Mercantile Company,—"for the purpose of covering and concealing a secret trust in favor of the said respondent bank, and for the purpose of hindering, delaying, and defrauding the creditors of said respondent company, and particularly your orators, in the collection of their just claims and demands against the said respondent company."

The bank, by its answer, denied, in substance, that the Mercantile Company had ever been its agent for the transaction of any business, or that it had ever transacted any business in the name of that company, or that it had ever made any statements to the commercial world such as were imputed to it in the bill of complaint, to the effect that the stock of the Mercantile Company was fully paid up, or concerning the value of its property and assets. It also denied in detail all other allegations contained in the bill which tended to show that it had become a party to any scheme to wrong or defraud the complainants or either of them. The case comes to this court on appeal from a decree in favor of the complainants below, which adjudged that the defendant bank should pay to the respective complainants the amount of their several demands against the Clarke Mercantile Company, all of which had been reduced to judgment, together with interest thereon at the rate of 8 per cent. per annum from and after November 2, 1895.

A. B. Seaman, for appellant.

Lucius M. Cuthbert (Henry T. Rogers and Daniel B. Ellis, on the brief), for appellees.

Before SANBORN and THAYER, Circuit Judges, and SHIRAS, District Judge.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It is claimed in behalf of the appellees, who were the complainants below, that the Clarke Mercantile Company indorsed the individual notes of A. K. Clarke, which were at the time held and owned by the appellant, the National Bank of Commerce in Denver, without receiving any consideration therefor, and that the indorsements in question were for that reason ultra vires and void. On the assumption that the indorsements were without consideration, it seems to be further contended that, when the Mercantile Company discharged its liability to the bank on account of such indorsements by paying the notes, it acted wrongfully and in fraud of the rights of the appellees, and that the money so paid on account of the indorsements can be recovered by them from the bank, notwithstanding the admitted fact that none of the debts now due to the appellees were contracted by the Mercantile Company until more than a year after the indorsements were executed. We think it sufficient to say, concerning this contention of the appellees, that the proof does not support the charge that the indorsements were executed without consideration. The trial court was of the same opinion, and we fully concur in its views on that point. The record discloses that, at the first meeting of the directors of the Mercantile Company, Clarke proposed to sell and convey to said company his entire stock in trade, consisting of liquors, cigars, fixtures, and all other property, provided the company would issue to him its entire capital stock as full paid and nonassessable, and provided, further, that the company would indorse the notes of said Clarke to the National Bank of Com-

merce in Denver, in the sum of $77,500, in consideration of the transaction. The proposition which was made by Clarke obligated him to further secure his notes to the bank by hypothecating a sufficient amount of the capital stock of the Mercantile Company, when the same was issued to him, but it was expressly stated in his proposition to the company that the indorsement of his notes to the bank should form a, part of the consideration for the proposed transfer of his stock in trade to the Mercantile Company. This proposition on the part of Clarke was accepted; his stock in trade was conveyed to the Mercantile Company; its total capital stock was issued to Clarke, or to such persons as were by him designated to receive it; and two notes of Clarke, one for $50,000 and one for $27,500, which were then held by the bank, were forthwith indorsed by the Mercantile Company. Moreover, we find no reason to doubt that the bank at that time held, as collateral security, many warehouse receipts for goods which then formed a part of Clarke's stock in trade, and we think it is most probable that the bank surrendered such collateral to enable Clarke to transfer his property and business to the Mercantile Company. In view of these facts, we think that the Mercantile Company did receive a valuable consideration for the indorsement of Clarke's individual notes, and that the contention to the contrary is without merit. It may be that the creditors of the Mercantile Company, in a proper proceeding, would be able to show that by the transaction in question the par value of its stock was not fully paid, but there is no greater reason for saying that the notes were indorsed without consideration than there would be for asserting that nothing was paid on the capital stock. The transfer of the stock in trade and the indorsement of the notes formed a part of the same transaction, and the former act was the consideration for the latter. Nor do we perceive that there was any want of power on the part of the Mercantile Company to execute the indorsements. It was organized "to carry on a wholesale, retail, and jobbing liquor, cigar, and tobacco business," which involved the right to purchase the requisite stock of such articles, and it could purchase the same either by paying cash therefor, or by indorsing the outstanding paper of the party from whom it acquired them, if that method of payment was deemed satisfactory.

The appellees also predicate a right to relief on the ground that the appellant bank conducted a wholesale and retail liquor, cigar, and tobacco business under the name of the Clarke Mercantile Company, for the bank's exclusive use and benefit, and that while doing so it made certain false and fraudulent representations to the business world concerning the amount that had been paid on the stock of the Mercantile Company, and concerning its assets and liabilities, whereby the appellees were deceived and induced to extend credit to that company. This charge appears to be based on the following facts, and is in the nature of a legal inference therefrom: When the Mercantile Company was formed, Clarke became, and so long as it was engaged in business continued to be, its president and chief managing officer. Such purchases and sales as were thereafter made by the company were made under his supervision and direction. He was actively engaged in controlling the daily business transactions of the company from the

date of its organization until January 12, 1895, when the Mercantile Company sold its property and the good will of its business to the Colorado Mercantile Company. On the organization of the Mercantile Company, which appears to have taken place on May 26, 1893, 1,998 shares of stock were issued to Clarke, and 1 share each to Benjamin Harrison and John S. Fowler, who, together with Clarke, became the first board of directors. Clarke immediately transferred 1,988 shares of his stock to William B. Morrison, who was the appellant's assistant cashier, as collateral, to secure his individual indebtedness to the appellant bank, and that amount of stock thereafter stood in Morrison's name, with a notation upon the stock ledger that he held it as "trustee for collateral security." On September 21, 1893, William F. Dieter was elected a director of the Mercantile Company in place of Benjamin Harrison, who had resigned. Dieter thereafter served the company in the capacity of director and bookkeeper, he having been recommended for the latter situation to the president of the Mercantile Company by one of the directors of the appellant bank. On June 4, 1894, Morrison, who had then acquired in his own right the one share of stock originally issued to John S. Fowler, became a director of the Mercantile Company in lieu of said Fowler, but he does not appear to have taken an active part in the daily business transactions of the Mercantile Company, which were, in the main, conducted by Clarke, with the assistance of Dieter, the bookkeeper. On April 18, 1895, Morrison resigned from the board of directors, and his resignation was duly accepted. There is testimony in the record which tends to show that on or about June 10, 1893, Clarke stated, in substance, to a representative of R. G. Dun & Co., when he was requested to make a statement concerning the assets and liabilities of the Mercantile Company, that its total assets aggregated $146,215.12; that the merchandise indebtedness which had been assumed by the company amounted to $22,559.54; and that he (Clarke) owed individually $76,500, which was secured by the hypothecation of his stock in the Mercantile Company. The testimony further shows that Dieter, the bookkeeper of the Mercantile Company, on March 30, 1894, handed to an agent of R. G. Dun & Co. another statement, showing that the total assets of the Mercantile Company at that time amounted to $125,627.93, and its liabilities to $10,000; but there is also evidence to the effect that the agent of R. G. Dun & Co., to whom the last-mentioned statement was furnished, well knew that the Mercantile Company was heavily indebted at the time to the appellant bank, and that such indebtedness had not been included in the aforesaid statement of its liabilities. While the evidence fully warrants the conclusion that the appellees were induced to credit the Mercantile Company on the strength of statements concerning its means and solvency that were circulated by various commercial agencies, and had been compiled from statements made by Clarke and Dieter, yet there is no evidence that such statements were made either by direction, or with the knowledge and sanction, of any of the managing officers of the appellant bank. The testimony further discloses that, after the Mercantile Company was formed, its business was generally conducted at a loss; that this was particularly the case in the season of 1894; that Clarke failed to induce certain parties, from whom he had been in the habit of purchasing goods,

to buy a part of his stock in the Mercantile Company and become interested in its business, as he had hoped to do when the company was formed; that having failed in the latter project, and the company being in great financial stress, Clarke, on or about January 1, 1895, resolved to sell the stock in trade of the Mercantile Company and the good will of its business, if he could find a purchaser for the same at a fair price; that he succeeded in finding a purchaser, and conferred with the officers of the appellant bank, which was the largest creditor of the Mercantile Company, concerning the proposed sale, and was aided and assisted by them to a large extent in the negotiations, which culminated, on January 12, 1895, in a sale to the Colorado Mercantile Company of the property and assets of the Mercantile Company for the sum of $50,000 in cash; and that the money so received by the Mercantile Company on the sale of its property and good will was deposited by it in the appellant bank, where it was applied, with the consent of the Mercantile Company, to the payment of its indebtedness to the appellant bank, which then amounted to about $78,000, including the balance unpaid on the individual indebtedness of Clarke, which had been indorsed by the Mercantile Company on the organization of that concern. Prior to January 12, 1895, it seems that $13,111 had been paid on Clarke's individual note of $27,500, which had been indorsed by the Mercantile Company; that said note had been canceled, and the balance due thereon had been included in another note of $25,000, which was drawn by the Mercantile Company and indorsed by Clarke. The note for $50,000, originally made by Clarke and indorsed by the Mercantile Company, appears to have been wholly unpaid on January 12, 1895, except such sums as may have been paid thereon in the way of interest.

Such, in brief, are the material facts on which the claim is based that the appellant bank transacted business in the name of the Mercantile Company, for its exclusive use and benefit, and that the representations aforesaid concerning that company's assets and liabilities were in fact made by the bank, and that the bank should be held accountable therefor.

We are of opinion, however, that the claim in question is not well founded. The Mercantile Company was a distinct legal entity, subject at all times to the control of its own officers, and it is clear, we think, that it did not become an agent of the bank either because Clarke hypothecated the bulk of its stock which he happened to own to secure a debt due to the bank, or because Morrison, an employé of the bank, served for a time on the board of directors of the Mercantile Company, or for both of these reasons combined. In a legal sense, a corporation does not become the agent of another, be it a corporation or an individual, because the latter holds a part of its stock in pledge to secure a debt; nor is the relation of principal and agent established, as between two corporations, because an officer or employé of one is a member of the board of directors of the other. It has even been held that, where the same person is acting as director in two corporations, knowledge acquired by him, while serving in the capacity of a director in one corporation, is not imputable to the other. Thomp. Corp. § 5214; and cases there cited. Moreover, while it may be conceded that one corporation may act as agent of another in a given transaction, or even

in a series of transactions, yet we do not understand it to be possible, for a corporation which has been incorporated to carry on a given business, to transact the whole of that business merely as the agent of, and for the exclusive benefit of, another. Ordinarily, a corporation is not even the agent of its own stockholders, in such a sense as to render them personally liable upon its contracts or for its wrongful or fraudulent acts, although its stockholders are entitled ultimately to the net profits realized from all corporate ventures; and it would be a strange result if the acquisition of stock in a corporation by one of its creditors, to be held as collateral security, or if the election of one of the creditor's employés to serve on its board of directors, should be held to place the corporation in the attitude of a mere agent. Such a conclusion is totally inadmissible. It is doubtless true, as has been suggested, that a large creditor of a corporation or of an individual, by virtue of being such, sometimes has such an influence over his debtor as enables him to control his actions in many ways; but this is a moral power, incident to the situation, which the law permits a creditor to exercise for his own benefit and advantage, even at the expense of other creditors, provided that he does not direct the doing of acts that are either illegal or fraudulent. The existence of such an influence, however, falls far short of establishing the relation of principal and agent, even where it is plain that it does exist and has been exercised. In the case at bar, it is obvious that the bank counseled and advised the Mercantile Company, through Clarke, its president, to sell its property and effects, and to apply the proceeds of the sale on the company's indebtedness to the bank; and it is very probable that the Mercantile Company was induced to a large extent, by such advice, to make the sale and such appropriation of the proceeds. But conceding this to have been the case, the transaction amounted to no more than a preference among creditors, all of whom had valid claims, and, considered by itself, we do not see that it gives the appellees any legal cause for complaint. It seems to be well settled in the state where the transaction took place, and in other jurisdictions as well, that a private business corporation, so long as it retains the custody and control of its property, may dispose of the same so as to pay the claims of one or more of its creditors, to the total exclusion of other equally meritorious claims, although it is at the time insolvent. In this respect a private business corporation has the same power to prefer creditors which is possessed by an individual. Its property and assets not being held in trust for equal distribution among all of its creditors, it may discriminate between them like a natural person, provided it pays honest debts and makes no distribution of its property among shareholders until all legal obligations to creditors have been discharged. West v. Produce Co., 6 Colo. App. 467, 41 Pac. 829; Burchinell v. Bennett (Colo. App.) 52 Pac. 51; Crymble v. Mulvaney, 21 Colo. 203, 40 Pac. 499; Sutton v. Dana, 15 Colo. 98, 25 Pac. 90; Gottlieb v. Miller, 154 Ill. 44, 39 N. E. 992; Henderson v. Trust Co., 143 Ind. 561, 40 N. E. 516; Jewelry Co. v. Volfer, 106 Ala. 205, 17 South. 525; Hollins v. Iron Co., 150 U. S. 371, 382, 14 Sup. Ct. 127; Railway v. Ham, 114 U. S. 587, 5 Sup. Ct. 1081; Graham v. Railroad Co., 102 U. S. 148, 160; Fogg v. Blair, 133 U. S. 534, 541, 10 Sup. Ct. 338; Gould v. Railway Co., 52 Fed. 680.

In concluding the discussion on this branch of the case, it is proper to observe that if the charge was well founded that the appellant bank carried on business in the name of the Mercantile Company, and while doing so made false representations, which were productive of damage to the appellees, then it would follow that a court of law could afford adequate relief for the alleged wrong, and there would be no occasion for seeking relief in a court of equity.

It is further urged that the decree of the lower court, compelling the bank to pay the appellees' claims out of the money which it received from the Mercantile Company on the sale of its property and good will, can be sustained upon the theory that the bank had a secret lien on the property of the Mercantile Company, or what was tantamount thereto, which was fraudulent as to its other creditors. This claim is based altogether on the state of facts heretofore detailed. It is said, in substance, that the bank held 1,988 shares of the stock of the Mercantile Company by a title which authorized it to vote the stock at all corporate meetings; that Morrison and Dieter, two of the directors of the Mercantile Company, while serving on its board, were subject at all times to the orders of the bank; and that by these means the bank had acquired a control over the Mercantile Company which was as obnoxious to the law as an unrecorded mortgage or bill of sale covering all of that company's property and assets.

We think, however, that it is an erroneous view that the bank had the right to vote the stock which stood in the name of Morrison on the books of the Mercantile Company. The testimony shows without contradiction that Clarke was the real owner of that stock, and that it had been placed in Morrison's name merely as collateral security for Clarke's indebtedness to the bank, without any agreement between Clarke and the bank that while it was so held it should be voted by the latter. Under these circumstances, the right to vote the stock depends upon a local statute of Colorado (1 Mill's Ann. St. Colo. §§ 495, 496), which is as follows:

"Sec. 495. No person holding stock in any corporation as executor, administrator, conservator, guardian or trustee, and no person holding such stock as collateral security, shall be personally subject to any liability as stockholder of such corporation, but the person pledging such stock shall be considered as holding the same and shall be liable as a stockholder accordingly, and the estate and funds in the hands of such executor, administrator, conservator, guardian or trustee, shall be liable in like manner and to the same extent as the testator or intestate, or the ward, or person interested in such trust funds would have been if he had been living and had been competent to act and held the stock in his own name.

"Sec. 496. Every executor, administrator, conservator, guardian or trustee shall represent the stock in his hands at all meetings of any such corporations and may vote accordingly as a stockholder, and every person who shall pledge his stock may nevertheless represent the same at all meetings and vote accordingly."

Reading both of these sections together, the term "trustee," as used in section 496, means, we think, a person who holds the legal title to stock for the benefit of some third party, who is the equitable owner thereof, and entitled to the dividends thereon, and whose property, whether held in trust or otherwise, is chargeable with whatever liability may result from the ownership of the stock. Persons holding

stock in trust for married women, minors, insane persons, spendthrifts, and the like would be included by the term "trustee," as used in section 496, supra; but a person in whose hands stock is placed by the real owner, to be held merely as collateral security for a debt due from himself to a third person, would not be so included. In cases of the latter sort, the stock involved is really held in pledge, and the right to vote the same, in the absence of an express agreement to the contrary, remains with the pledgor. Brewster v. Hartley, 37 Cal. 15–25. Such we understand to be the construction which has been placed upon the Colorado statute by the supreme court of that state, and similar views have been expressed elsewhere. Miller v. Murray, 17 Colo. 417, 30 Pac. 46; Vowell v. Thompson, 3 Cranch, C. C. 438, Fed. Cas. No. 17,023; Hoppin v. Buffum, 9 R. I. 513–518; Allen v. Hill, 16 Cal. 113; Com. v. Dalzell, 152 Pa. St. 217, 25 Atl. 535.

Concerning the charge that Morrison and Dieter, while serving on the board of directors of the Mercantile Company, were mere agents of the bank, we deem it sufficient to say: First, that both of these persons were duly qualified to serve as members of the board by their ownership, in their own right, of one share each of the stock of the Mercantile Company; and, in the second place, that we fail to find any evidence in the record which would justify a finding that Dieter was a special representative of the bank on the board of directors, and that he was unduly or unlawfully swayed by its influence. He was the bookkeeper of the Mercantile Company, and was employed for that purpose by its president. He devoted all of his time to its service, and was paid for his services by the company. In short, he bore no such relation to the bank as would indicate that it could or did control his actions in an unlawful manner. Indeed, when the facts of the case are fully analyzed, it will be found, we think, that the control which the bank exercised over the Mercantile Company was mainly due to the fact that it had made advances to the company and was its largest creditor. It was a moral influence, due to this circumstance, which the bank seems to have exerted over the Mercantile Company, rather than any legal power that it had acquired to control its actions or business policy. The directors of the Mercantile Company seem to have retained the power at all times to transact the corporate business as they deemed best, and two of them, at least (Clarke and Dieter), did not occupy such a relation to the bank as disabled them from exercising an independent judgment, or acting at all times as they thought proper.

We have already stated, in substance, that the evidence does not support the contention that the bank should be held responsible to the appellees for the statements which were made by Clarke and Dieter, relative to the financial condition of the Mercantile Company, and on this branch of the case it is proper to observe, further, that the testimony does not warrant the conclusion that the bank wrongfully concealed its relation as a creditor of the Mercantile Company, or resorted to any artifice to prevent such relation from becoming known. No statute of the state of Colorado, and no business usage of which we are aware, made it obligatory on the bank to give public notice of the amount of its claim against the Mercantile Company; and it goes

without saying that, in the absence of such a statute, its full duty was discharged by refraining from making any false statements or spreading any false reports concerning the amount of such indebtedness. In point of fact, the existence of the debt, and the proximate amount thereof, was known to some of the appellees as early as March 22, 1894; since the evidence shows that on that day some of the appellees were furnished with a statement by Bradstreet's Commercial Agency, which contained the information that the Mercantile Company owed a local bank in Denver about $60,000, and that the stock of the Mercantile Company was hypothecated to secure such indebtedness, and was virtually owned by the pledgee.

In view of these considerations, we are unable to discover any reasons which will warrant a ruling that the control which the bank exercised over the Mercantile Company was tantamount to a secret lien on its property and for that reason fraudulent. Such influence as it exercised over the Mercantile Company it had acquired by means which the law esteems lawful. It concealed no fact which the law required it to make known. Moreover, it had no legal power to control the corporation, since the majority of that company's directors were under no obligations to the bank which can be assumed to have rendered them unduly subservient to its wishes.

In support of the proposition which is now under consideration, the appellees have invited our special attention to the case of American Oak-Leather Co. v. C. H. Fargo & Co., 77 Fed. 671, which seems to have controlled the action of the trial court in rendering a decree in favor of the appellees. In that case it appeared that an insolvent business corporation had executed judgment notes in favor of three of its creditors, and had agreed that it would not execute like notes in favor of any of its other creditors. To make the latter agreement effectual, and for no other purpose, its president and secretary and the majority of its directors resigned, and their places were filled by clerks of the attorneys for the favored creditors who had concocted the scheme. The corporation was thus left bound in the hands of the favored creditors who had been vested with power to make the potential liens actual liens at any moment. It was held, in substance, that judgment notes executed under such circumstances had all the vices of a secret lien. The facts disclosed by the present record, as heretofore detailed, are, in our judgment, materially different from those last recited. The bank held no obligation of the Mercantile Company which it could transform at will into an actual lien upon its property; neither did it have a like power to control the action of the debtor company. The result is that, if we give to the case cited its full weight, we fail to discover, in the facts upon which it was predicated, anything which will serve to alter the conclusions heretofore announced.

One further question affecting the jurisdiction of the trial court is presented by the record which deserves notice. Several of the appellees who intervened in the suit which was commenced by Paris, Allen & Co., and who became co-complainants after that suit was instituted, did not have claims against the Mercantile Company amounting to as much as $2,000, exclusive of interest and costs, and with respect to

those claims it is contended by the appellant that the circuit court did not have jurisdiction, although said claims had been severally reduced to judgment. The jurisdiction of the trial court over the action brought by Paris, Allen & Co. is conceded, since that firm had obtained a judgment against the Mercantile Company in the sum of $3,249.42. The question, therefore, is not whether several judgment creditors whose claims are each less than $2,000 can aggregate them and bring a joint suit for the purpose of maintaining a creditors' bill in the federal court, but the precise question at issue is whether certain judgment creditors whose judgments were each less than $2,000 had the right to intervene after another creditors' bill had been filed in the federal court over which that court had undoubted jurisdiction. This question, we think, should be answered in the affirmative. The original bill was exhibited for the purpose of reaching a specific fund alleged to be in the hands of the appellant bank, and subjecting the same to the payment of judgments against the Mercantile Company, on the theory that the bank had acquired the fund in fraud of the rights of creditors; and while it is true that the court ultimately rendered a money decree against the bank requiring it to pay specific sums of money to each of the several complainants, yet, in the progress of the case, it might have found it necessary to have appointed a receiver of the fund, or to have required its payment into court for the purpose of distribution. Had the property proceeded against been land or goods and chattels, it would probably have found it necessary to have appointed a receiver. The suit was clearly one to reach a specific fund, and subject it to the payment of debts of the Mercantile Company, and, being a suit of that nature, the court in which such bill was first filed acquired the right to administer the fund without let or hindrance on the part of any other court, according to the principles announced by this court in the cases of Merritt v. Barge Co., 49 U. S. App. 85, 93, 24 C. C. A. 530, and 79 Fed. 228, and Gates v. Bucki, 12 U. S. App. 69, 4 C. C. A. 116, and 53 Fed. 961. We think, therefore, that after the original bill had been filed, and the fund proceeded against had thereby been brought within the jurisdiction of the court in such a sense that if it thought proper it could have taken the fund into its own custody, other judgment creditors had the right to intervene for the protection of their interests, even though their judgments were severally less than $2,000. If they had been compelled to file bills in the courts of the state to reach the same fund and subject it to the payment of their judgments, such a course of procedure might eventually have led to a conflict of jurisdiction. Besides, we do not understand that the provision of the judiciary act limiting the right to sue to cases which exceed $2,000, exclusive of interest and costs, has any application to cases like the one at bar, where a judgment creditor intervenes and becomes a party to a creditors' bill already filed, which was exhibited by a judgment creditor whose judgment exceeded the jurisdictional amount, and which was filed for his own benefit and for the benefit of others similarly situated who might come in and contribute to the expense of prosecuting the suit. The right of a judgment creditor to file a bill in behalf of himself and other judgment creditors who may elect to join in the proceeding and contribute to the

expense, has been recognized from time immemorial by courts of equity, chiefly because such practice lessens litigation and is also convenient. It is hardly probable, therefore, that the provision of the judiciary act last referred to was intended to change the established practice so as to prevent a judgment creditor from intervening in a proceeding already brought to collect a judgment in excess of $2,000, excluding interest and costs, if his own claim happened to be less than that sum. The cases chiefly relied upon by the appellant's counsel to sustain a contrary view (Gibson v. Shufeldt, 122 U. S. 27, 7 Sup. Ct. 1066; Seaver v. Bigelows, 5 Wall. 208; Ex parte Baltimore & O. R. Co., 106 U. S. 5, 1 Sup. Ct. 35; Clay v. Field, 138 U. S. 464, 479, 11 Sup. Ct. 419) are cases where the right of appeal to the supreme court was denied in consequence of the amount involved in the appeal, and, in our judgment, they are not in point on the question at issue. The objection to the jurisdiction of the trial court is accordingly overruled, but, as the decree appealed from was erroneous, the same will be reversed, and the cause will be remanded for further proceedings in accordance with this opinion.