## Case No. 169.

ALEXANDER et al. v. HORNER et al.

[1 McCrary, 634;[1] 9 Cent. Law J. 111.]

Circuit Court, E. D. Arkansas. April, 1879.

POWERS OF INSURANCE COMPANIES — PROMISSORY NOTE—PAYMENT—FRAUD—NON-JOINDER OF PARTIES—PRACTICE.

1. Insurance companies have the power to take and hold negotiable notes and other securities in the general conduct of their business, and this includes the power to negotiate them.

2. The maker of a note, who pays it to an indorsee and holder who obtained it by fraud, is discharged from liability thereon to the payee, unless the maker had notice of such fraud; and the discharge extends as well to the original consideration.

3. Where, in such a case, the payee files a bill in equity to avoid the assignment and compel the maker to pay the note a second time, upon the ground that he had notice of the fraud, the alleged fraudulent indorsee to whom the payment was made is an indispensable party.

[Cited in Chadbourne v. Coe, 51 Fed. Rep. 482, 2 C. C. A. 327.]

4. The objection of the non-joinder of necessary parties is not required to be raised by the pleadings; it may be made on the hearing, and it may, and in a clear case ought to, be raised and acted upon by the court on its own motion.

[Cited in Chadbourne v. Coe, 51 Fed. Rep. 481, 482, 2 C. C. A. 327.]

In equity. L. E. Alexander, as receiver of the Columbia Life Insurance Company, and the company, are named as plaintiffs [and Horner and Horner and A. M. Britton as defendants] in the bill, which alleges that the company is a Missouri corporation; that on the eighteenth of October, 1877, it was, by decree of the circuit court of St. Louis county, adjudged to be insolvent and enjoined from doing further business, and the plaintiff, Alexander, appointed receiver of its property and assets, with authority to sue for their recovery, etc.; that pursuant to the terms of the decree, the company executed an assignment of all its property and assets to the receiver, and by the terms of the same decree the corporation was dissolved. The bill alleges further, that on the twenty-ninth of November, 1872, the defendants were "indebted" (it is not alleged this indebtedness was for a stock subscription or how it arose) to the Mound City Mutual Life Insurance Company in the sum of $5,830, for which sum they made their notes, payable to the company, and secured the same by deed of trust on lands in Arkansas; that the name of the last-mentioned corporation was changed successively, to Mound City Life Insurance Company, to St. Louis Life Insurance Company, and lastly to Columbia Life Insurance Company, but the corporation continued the same; that the company was insolvent on the twenty-third of November, 1875, and for some time prior to that date, and so continued until it was judicially declared to be insolvent; that on the twenty-third of November, 1875, a combination was entered into between Alfred M. Britton and George J. Davis, both of whom were directors in the life insurance company (the former its vice-president and acting president and the latter an attorney for the company) and the Life Association of America, to get possession of the assets of the life insurance company by fraudulent means; that in execution of this fraudulent scheme, Britton, Davis, and the life association, in December, 1875, obtained possession of the notes of the defendants and the deed of trust given to secure the same, and cancelled and delivered them to the defendants; that the life insurance company received no consideration from Britton, Davis, or the life association for these notes, and that the defendants paid nothing for their surrender, but only gave in exchange therefor shares of stock in the company, which were worthless, because the same had never been paid for and because the company was insolvent; and that defendants had notice of these alleged facts. Horner and Horner, the makers of the notes, and who are citizens of Arkansas, and Britton, the trustee named in the deed of trust, and who is a citizen of Texas, are made defendants. Davis and the Life Association of America are not made defendants, because they are, as the bill alleges, beyond the jurisdiction of the court, and cannot be joined without ousting the jurisdiction, being citizens of the same state as the plaintiff. Prayer for decree for amount of notes and foreclosure of deed of trust.

The defendants, answering, say the notes were given by them in payment for $5,000 subscription to the capital stock of the company; that the stock issued to them was full paid stock; they deny all knowledge of the insolvency of the company, or of any conspiracy or fraud on the part of Britton, Davis and the Life Association of America to ob-

---

[1] [Reported by Hon. Geo. W. McCrary, Circuit Judge, and here reprinted by permission.]

tain possession of their notes; and allege that in the month of November, 1875, they were advised by another stockholder, residing in Helena, that Britton, upon whose representations they subscribed for the stock, and in whom they had confidence, was about to retire from the directory of the company; that they could then sell their stock for par, or possibly something more, to parties who were buying it up; that, after consultation, the Helena stockholders reluctantly agreed to sell their stock, because they believed it was actually worth much above par if the true condition of the company could be known, and they only consented to sell for the reason that they could not be on the ground personally to ascertain and look after their interests, and believed if they did not sell some means would be resorted to to crowd them out; that thereupon they sent their certificates of shares of stock in the company, indorsed in blank, to Herman & Rainey, their correspondents in St. Louis, and authorized them to sell the same, but in no event for a less sum than would be sufficient to pay off their notes then held by the company; that their correspondents afterwards advised them that they had sold their stock to George J. Davis, and taken in payment their notes due to the company and $176.80 in money, and inclosed a check for that sum, and their notes duly assigned by the company to Davis, and by him cancelled, and also a deed of release of the deed of trust, executed by Britton, the trustee; that they never heard of George J. Davis until they saw he was the assignee of their notes, and were informed by their correspondents that he had purchased their stock; that they believed the company was solvent, and would not have sold their stock for less than par; that they acted in good faith, and had no suspicion of any fraud, or that fraud was charged upon any one in connection with the transaction, until the filing of the bill in February, 1878, more than three years afterwards; and these allegations of the answer are well supported by the evidence.

It is shown by the evidence that on the twenty-third of November, 1875, the Life Association of America entered into a contract with George J. Davis, by which the former agreed to purchase from the latter nine thousand four hundred shares of the capital stock of the St. Louis Life Insurance Company, and as much more, up to ten thousand shares (the whole capital stock of the company), as Davis might transfer and deliver within thirty days. Contemporaneously with the delivery of the stock of the insurance company, Davis was also to deliver to the life association certain other stocks and securities mentioned in the contract, then owned by the insurance company. Davis was to receive for the nine thousand four hundred shares and other securities $1,215,000, and par value for all shares delivered in excess of that number. The mode of paying Davis for this stock and securities was prescribed with some detail, the substance of which was, that about ninety per cent. of the sum was to be paid in the draft of Hough, president of the life association, on the life association, and accepted by it, payable at one day's sight, and the remainder in cash, on delivery of the stock and other securities mentioned in the contract. Having made this contract with the life association, Davis resigned as a director of the insurance company, and on the thirtieth of November, 1875, made a proposition to the life insurance company to purchase from it the securities mentioned in his contract with the life association at prices stated in his proposition, and at a meeting of the board of directors of the life insurance company on that day, the record shows the following proceedings were had:

"Mr. Davis then submitted a list of securities belonging to the company which he desired to purchase, the price being satisfactory, and for payment of which he would give the draft of H. W. Hough, president, on the life association to his (Davis') order at one day's sight, and accepted by said life association. After an examination of the list and full discussion thereof, the following resolution, offered by Mr. Bogy, was adopted:

"Resolved, that the vice president be authorized to sell and deliver to Mr. George J. Davis the following securities, or any one or all of said securities, at the price named in the list hereto appended, and that the vice president be authorized to receive in payment for the securities so sold and delivered, the draft of H. W. Hough, president. drawn at one day's sight, to the order of G. J. Davis, and by him indorsed, on the Life Association of America, and by said life association accepted." Then follows a list of the securities sold (which are the same mentioned in the contract between Davis and the life association), with prices annexed to each, amounting in the aggregate to $1,111,898.34. Among the securities thus sold to Davis were the notes of the defendants, which were afterwards duly indorsed by the insurance company and delivered to him. Davis having delivered the stock and other securities to the life association under the contract of November 3, 1875, received in payment some cash and the draft of the life association for $1,111.898.34. This draft Davis indorsed and delivered to the insurance company on the tenth of December, 1875.

In the proceedings of the board of directors on that day, it set forth that the president of the company stated to the board for its information, "that Mr. G. J. Davis had tendered him this day the draft as specified in the resolution of the board, passed November 30, in the sum of $1,111,898.34, and that in accordance with the authorization of said resolution he had sold and delivered to Mr. Davis the securities named." At

the conclusion of this transaction the directory of the insurance company resigned, and the life association, now the holder of the stock of the former company, elected a directory composed mainly, if not altogether, of the same persons who constituted the directory of the life association. In 1876, by an amendment of its charter approved by the superintendent of the insurance department of the state, the name of the company was changed to the Columbia Life Insurance Company, and it was authorized by a two-thirds vote of its board of directors to reduce the capital stock of the company, then ten thousand shares of the par value of $100 each, to any amount not less than $100,-000. To effect this reduction, the surplus assets of the company might be used to purchase in the stock of the company. Under this authority the directory resolved on a reduction of nine thousand shares of the capital stock, and to effect the reduction, set aside $900,000, alleged surplus funds, and afterwards purchased that number of shares at par—$900,000—from the life association, and paid therefor by cancelling that amount of the draft of the life association given by it to Davis, and by him indorsed to the life insurance company under its contract for the purchase of its securities. The balance of that draft, viz.: $211,898.34, was liquidated by cash payments and other transactions between the companies. The life insurance company continued to be a going concern until it was adjudged to be insolvent. The evidence is conflicting as to whether it was, in fact, a solvent institution in December, 1875, but it was reputed solvent and to be doing a profitable business, and its stock was then worth par in the market. The life association is still a going concern. The superintendent of the insurance department, in the proceedings in which the company was adjudged insolvent, made no complaint against the reduction of the stock of the company nor the sale of its securities to Davis; nor has the company or any stockholder or creditor, or the receiver, had these transactions annulled by a direct proceeding for that purpose, or taken any steps to that end, so far as this record shows. The bill does not allege, nor do the proofs disclose the condition of the company, otherwise than generally that it is insolvent; nor are the equities of any of the creditors disclosed; nor does the bill offer to surrender up to defendants the shares of stock they sold to Davis, or make any suggestion in relation thereto, other than that it is worthless. [Bill dismissed.]

W. W. Smith and Smith & Collins, for plaintiff.

Tappan & Horner, for defendants.

CALDWELL, District Judge. The board of directors of the insurance company had an undoubted right to sell the defendants' notes and other securities to Davis, and authorize its secretary to indorse them as was done. Banks, insurance companies, and other like corporations, have the power to take and hold negotiable notes and other securities in the general conduct of their business, and this includes the power to negotiate them. Hardy v. Merriwether, 14 Ind. 203; McIntire v. Preston, 5 Gil. [10 Ill.] 48; Nicholas v. Oliver, 36 N. H. 218; Spear v. Ladd, 11 Mass. 94; Northampton Bank v. Pepoon, Id. 288; Lester v. Webb, 1 Allen, 34. The notes were negotiable, and their assignment and delivery invested Davis with the legal and equitable title to them and the right to receive payment and cancel them. He did receive payment from the makers—the defendants—in shares of stock in the company, then worth par in the market, and cancelled and surrendered up the notes to them.

The amended answer and the deposition of J. J. Horner make it certain that the defendants, in this case, had no knowledge or suspicion personally, or through their agents, that Davis had obtained their notes by fraud, or that there was any infirmity in his title; and, having paid the notes in good faith to Davis, the indorsee and holder, the plaintiff cannot compel the defendants to pay the notes a second time, even if Davis was a fraudulent holder. Payment to the thief or finder himself, of a negotiable note transferable by delivery, will discharge the maker, provided such payment was not made with knowledge or suspicion of the infirmity of the holder's title, or under circumstances which might reasonably awaken the suspicions of a prudent man. Byles, Bills, 213. Nothing short of fraud, not even gross negligence, if unattended with mala fides, will invalidate the payment so as to take away the rights founded thereon. Story, Bills, § 416; Edw. Bills, § 537. The bill counts upon the notes exclusively; it does not seek a recovery upon a stock subscription, nor does it even allege that the notes were stock notes. The answer discloses that the notes were given for a subscription to the capital stock of the company, but that fact did not render the notes any the less negotiable, or prevent the company from negotiating them, or excuse the defendants from paying them to the indorsee and holder; and when paid in good faith to the holder, the company can have no claim against the makers, either upon the notes or for the original consideration.

It is not true the defendants paid nothing of value for the notes. The shares of stock owned by the defendants were issued as full paid shares; the stock was then worth par in the market; the defendants refused to sell it for less, and Davis agreed to give par for it. The test is its then market value, and not what it was really worth in the light of subsequent events. The company having indorsed and transferred the notes to Davis, it is not open to it to object that he dis-

charged the debt for an inadequate consideration, if the defendants had no notice of the alleged fraud and acted in good faith. If Davis had been a bona fide holder of the notes, he could not successfully maintain that they had not been fully paid, and no more can the company.

The bill is fatally defective for want of proper parties. The gravamen of the plaintiff's bill is that Davis and the life association, acting in concert, fraudulently procured the assignment and transfer of the defendants' notes from the company to Davis. It is not alleged in the bill, nor was it claimed in argument, that defendants were parties to that fraud; it is claimed that their agent only had notice of it before paying the notes. Obviously the plaintiff has no case unless he can impeach and set aside the sale and transfer of these securities to Davis. Davis ought to be a party to any bill seeking to do this. He is entitled to an opportunity to repel the imputation of fraud and protect himself from liability if he can do so; the defendants are entitled to his aid in defending the action; and as he would be liable over to the defendants, in the event of the plaintiff's recovering, he must be made a party for the protection of the defendants, and to avoid multiplicity of suits. Robertson v. Carson, 19 Wall. [86 U. S.] 94. The defendants have a right to insist that Davis shall be brought in; and on the averments in the bill the life association also, because if they are compelled to pay their notes a second time they are entitled to an action over against these parties, to be reimbursed the amount paid them or Davis in satisfaction of their notes, which would be the par value of their stock, that being the market value as well as the agreed value between Davis and the defendants. But as Davis and the life association are not made parties, it would be open to them in any suit that the defendants might bring against them to be reimbursed the amount of plaintiff's recovery, to contest the question of fraud in the transfer of these securities to Davis, and it might result that the court or jury trying that issue would find the transfer was not fraudulent, and thus the defendants would be wronged in a mode that would leave them no redress. Equity will not permit a plaintiff to put a defendant in this predicament. The rule is well settled that where, in the event of the plaintiff's succeeding, the defendants will be subjected to undue inconvenience, or to danger of loss or to future litigation, or to a liability under the decree more extensive and direct than if the absent parties were before the court; or will thereby acquire a right to call upon the absent parties either to reimburse him the whole or a part of the plaintiff's demand; then such absent parties must be brought before the court in order that the rights and liberties of all may be settled by one proceeding and a multiplicity of suits

avoided, with a possible different determination of the same issue, to the irreparable injury of the defendant sued. Story, Eq. Pl. §§ 136, 138; 1 Daniel, Ch. Pl. & Pr. 281, 282; Robertson v. Carson, 19 Wall. [86 U. S.] 94; Milroy v. Stockwell, 1 Cart. (Ind.) 35.

Anticipating this objection, and with a view to avoid it, the plaintiff alleges in his bill that Davis and the life association are beyond the jurisdiction of the court and citizens of the same state as the plaintiffs, and cannot therefore be made parties without ousting the jurisdiction of the court. The learned counsel for the plaintiffs argued earnestly that these averments, under the act of congress of February 28, 1839, (section 737, Rev. St.,) and the 47th equity rule, dispensed with the necessity of making these parties defendants. This argument has often been made before, and always unavailingly in a case like this. The supreme court of the United States have divided parties to suits in equity into three classes: (1) formal; (2) necessary or proper; and (3) indispensable. The first two classes may be dispensed with; the third, never. The absent parties in this case are indispensable parties, as that term is defined and applied by the supreme court. The act of congress and the 47th rule effected no change of the law on this subject of parties to suits in equity. In the leading case upon this subject the supreme court say: "The act of congress does not affect any case where persons are not joined because their citizenship would defeat the jurisdiction; and so far as it touches suits in equity it is no more than a legislative affirmance of the rule previously established by the decisions" of that court. "And the 47th rule is only a declaration for the government of practitioners and courts, of the effect of this act of congress and of the previous decisions of the court on the subject of that rule. It remains true, notwithstanding the act of congress and the 47th rule, that a circuit court can make no decree affecting the rights of an absent person, and can make no decree between the parties before it, which so far involves or depends upon the rights of an absent person that complete and final justice cannot be done between the parties to a suit without affecting these rights, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." Shields v. Barrow, 17 How. [58 U. S.] 130. And in a late case the court say: "The act of congress of 1839, and the rule of this court upon the subject, give no warrant for the idea that parties whose presence was before indispensable could thereafter be dispensed with." Ribon v. Railroad Co., 16 Wall. [83 U. S.] 450; and the rule established in these cases has been affirmed, illustrated and applied in many other cases. Kendig v. Dean, 97 U. S. 423;

Florida v. Georgia, 17 How. [58 U. S.] 508; Coiron v. Millaudon, 19 How. [60 U. S.] 115; Barney v. Baltimore City, 6 Wall. [73 U. S.] 284; Florence Sewing-Mach. Co. v. Singer Manuf'g Co., [Case No. 4,884;] Tobin v. Walkenshaw, [Id. 14,068;] Litchfield v. Register, [Id. 8,388.] The ruling in Robertson v. Carson, 19 Wall. [86 U. S.] 94, is directly in point in this case, and concludes the question.

Counsel for plaintiff urge that the rules as to parties in equity are somewhat flexible; that the 47th rule in terms empowers the courts to dispense with "necessary or proper parties, in their discretion;" and attention is called to the case of Elmendorf v. Taylor, 10 Wheat. [23 U. S.] 152, where it is said the objection for want of parties does not affect the jurisdiction, but addresses itself to the policy of the court, and is subject to its discretion. Neither the rule nor the case cited touch the question of indispensable parties; the term itself implies they can never be dispensed with. And the absent persons in this case belong to that class, and not only cannot be brought in on account of their common citizenship with the plaintiff, but they would not be permitted to come in; and in all such cases the court cannot act at all, but will leave the parties to terminate their dispute by other means. Florida v. Georgia, 17 How. [58 U. S.] 508; Florence Sewing-Mach. Co. v. Singer Manuf'g Co., [Case No. 4,884;] Kendig v. Dean, 97 U. S. 423. And if the absent persons were not indispensable parties but only "necessary or proper," and if the 47th rule invested the court with the discretion to proceed or not with the case in the absence of such parties, there is nothing in the case calling for an exercise of that discretion favorable to the plaintiff, but the reverse, as will be seen from a brief resume of the case.

The bill only seeks to set aside the contract between Davis and the company so far as it concerns the defendants' notes; it does not seek to set aside the contract as to the other securities embraced in it; nor does the plaintiff offer to repay what the company received in cash on this sale of its securities or any part of it; or to surrender back to defendants their stock; or to place any of the parties in statu quo, nor does it seek to annul the subsequent action of the company by which it blotted out of existence nine-tenths of its capital stock, including the shares formerly owned by the defendants, and which reduction was effected by using as cash the draft received from Davis on the life association. The validity of the company's action in reducing its stock $900,-000 by the purchase of nine thousand shares from the life association and its cancellation ought to be determined before any relief is granted; for if that action was valid, it amounted to a ratification of all that had gone before, and the company ought not to be heard to assert that Davis did not pay

value for securities transferred to him when it appropriated and used the draft received from him as money. But that transaction cannot be inquired into in this case, because the bill does not attack, or even refer to it; and if it did the indispensable parties to its determination are not before the court.

Passing by the originators, actors and participants in the alleged fraud, all of whom are citizens of the same state as the plaintiff, and solvent, so far as the record discloses anything on that subject; affirming the sale of the company's securities to Davis, so far as it profited by it; keeping all that was obtained by that transaction and the subsequent operations based on the fruits of that transaction; the plaintiff seeks a recovery against defendants, admittedly innocent of any participation in the alleged fraud, by proceeding in a mode that would deprive them of that sure recourse on the actual parties to the alleged fraud, to which they would be entitled, and in a mode that would probably result in exempting the actual perpetrators of the fraud from liability altogether.

A plaintiff occupying this attitude has no claims to the favorable exercise of an equitable discretion on the subject of parties, if such discretion exists, which is not decided. Objection for the non-joinder of necessary parties need not be taken by demurrer, plea or answer; it is open to the defendant to make it any time; and it may, and in a clear case ought to, be raised and acted upon by the court on its own motion. These conclusions render it unnecessary to decide whether the transactions between Davis and the life association and the life insurance company were or not fraudulent, or to rule upon the other questions presented at the hearing.

Decree dismissing bill without prejudice.