WATSON et al. v. BONFILS et al.

(Circuit Court of Appeals, Eighth Circuit. April 24, 1902.)

No. 1,653.

1. JURISDICTION OF FEDERAL COURTS—CITIZENSHIP IN TERRITORIES FATAL.

A national court has no jurisdiction of a suit which involves a controversy between a citizen of a state and a citizen of a territory, and the fact that citizens of different states are interested in the controversy and are made parties to the suit does not remove the fatal objection.

2. SAME—CITIZENSHIP OF REAL AND PROPER PARTIES MATERIAL, OF NOMINAL PARTIES IMMATERIAL.

The citizenship of nominal parties to a suit is not material and may be disregarded, but the citizenship in a state or foreign country by every proper party who has a real interest in the controversy involved in the suit is essential to the jurisdiction of a federal court on the ground of diversity of citizenship.

3. SAME—PROPER PARTIES REAL PARTIES TO A SUIT.

A party who has a real controversy with the opposing parties to a suit, which presents a common point of litigation, that affects its entire subject-matter, and the decision of which will settle the rights of all the parties to the suit, is a proper and real party to the suit.

4. SAME—PRESUMPTIONS—DIRECT AND COLLATERAL ATTACK.

In a direct attack upon a judgment or decree of a federal court by writ of error or appeal, the record must affirmatively show the jurisdiction of the court which rendered it. But on a collateral attack, jurisdiction is presumed.

5. SAME—AMENDMENT TO SHOW PERMISSIBLE IN CIRCUIT COURT, BUT NOT IN APPELLATE COURT.

Where, through the mistake or inadvertence of one of the parties, the requisite averments of citizenship have not been made, an appellate court may reverse and remand the case, with leave to the court below to permit amendments to show its jurisdiction, but it has no power to permit such amendments in the appellate court.

6. FRAUDULENT CONVEYANCES—EQUITABLE INTEREST.

A conveyance by a debtor of its leviable equitable interest in land with intent and in furtherance of a scheme to induce parties to become its creditors, and to delay and defraud them, is voidable at the election of existing and subsequent creditors.

7. SAME—USE OF LEGAL INSTRUMENTS TO EFFECT. NO BAR TO AVOIDANCE.

The use of sheriff's deeds and other legal instruments to effect a fraudulent conveyance of property by a debtor is no bar to its avoidance.

8. SAME—SCHEME TO DEFRAUD.

A bank devised the scheme to run the title to all the real estate upon which it foreclosed mortgages into a realty corporation whose stock it held, and to take notes and mortgages upon the real estate for the amounts due by the former mortgagors. The result was that it procured notes of the realty corporation, which was insolvent, for $330,000, many of which were partially secured by mortgages; and it carried these notes and the worthless stock of the realty company, $100,000 in amount, at par, among its assets. *Held*, that the plan disclosed an intent to obtain creditors by deceit and to defraud them, and sheriff's deeds and conveyances made in furtherance of the scheme were voidable for fraud at the election of the creditors.

9. TRUSTS—EXPRESS FORBID INFERENCE OF IMPLIED WITH DIFFERENT TERMS.

An express trust prohibits the inference from the same transaction of an implied trust on different terms. Where parties agree that property

¶ 1. Diverse citizenship as ground of federal jurisdiction, see notes to Shipp v. Williams, 10 C. C. A. 249; Mason v. Dullagham, 27 C. C. A. 298.

shall be transferred to and held by a corporation under the express trust which the relation of a corporation to its creditors and stockholders creates, and it is transferred to the corporation accordingly, they are estopped from claiming that an implied trust of different terms arose from the transaction, and no such trust can be inferred between them.

10. CORPORATION — SOLE STOCKHOLDER AND CREDITOR CANNOT IGNORE ITS EXISTENCE.

A corporation is an entity distinct from its stockholders and creditors, and a sole creditor and stockholder of a corporation cannot ignore its existence, and convey, incumber, or deal with its property without the action of the corporation.

11. GENERAL ASSIGNMENT—ASSIGNEES CANNOT AVOID CONVEYANCES FRAUDULENT AS TO CREDITORS.

A general assignment for the benefit of creditors under the laws of Missouri and under the common law does not vest in the assignees the rights of creditors to avoid the fraudulent conveyances of the assignor. It conveys what the assignor has, but nothing that he has transferred by conveyances good against him, but fraudulent as to his creditors.

12. GENERAL ASSIGNMENT—EFFECT IN ANOTHER STATE.

A general assignment made in one state (Missouri) vests no better title in, and grants no greater power or rights to the assignees in, another state (Kansas), than it gave them in the state where it was made.

13. SUBSEQUENT ATTACHMENTS OF REAL ESTATE FRAUDULENTLY CONVEYED SUPERIOR TO TITLE OF ASSIGNEES UNDER LAWS OF MISSOURI AND COMMON LAW.

Subsequent attachments of real estate fraudulently conveyed by an assignor by deeds good against him are superior in law and in equity to the title of assignees under a general assignment under the laws of Missouri and the common law.

Caldwell, Circuit Judge, dissenting.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of Kansas.

George B. Watson, Silas Porter, and Junius W. Jenkins (A. E. Watson and Henry McGrew, on the brief), for appellants.

Frank Hagerman and L. W. Keplinger (O. L. Miller, C. F. Hutchings, William Warner, O. H. Dean, W. D. McLeod, Hale Holden, and Albert H. Horton, on the briefs), for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge.  This is an appeal from a decree in favor of the complainants, certain creditors of an insolvent bank, which avoids liens of attaching creditors upon real estate in the state of Kansas, and impresses a trust in favor of all the creditors of the bank upon it under a general assignment which the bank made in the state of Missouri.

The only ground of the jurisdiction of the circuit court was diversity of citizenship.  One of the defendants, an attaching creditor, was a citizen of the territory of Oklahoma.  A national court has no jurisdiction of a suit or controversy between a citizen of a state and a citizen of a territory, and the joinder or association of citizens of states with the respective parties to such a suit or controversy does not re-

¶ 11. See Assignments for Benefit of Creditors, vol. 4, Cent. Dig. §§ 526, 752.

move the fatal objection. City of New Orleans v. Winter, 1 Wheat. 91, 95, 4 L. Ed. 44; Barney v. Baltimore City, 6 Wall. 280, 287, 18 L. Ed. 825. Counsel for complainants are met at the opening of their argument in support of their decree by this conceded fact, and this indisputable principle of law, and they devote more than 20 pages of their printed briefs to attempts to escape from the logical result to which they lead. They say that the federal courts have jurisdiction of controversies between citizens of different states, and hence of any controversy between citizens of different states; that in this suit there were a number of separate controversies between citizens of different states, in which Jeoffroy, the citizen of Oklahoma, had no interest, because his attachment was late, and subject to prior attachments, one of which, for example, had ripened into a sale and a sheriff's deed of certain parts of the real estate he attached before this suit was instituted, so that Jeoffroy had no interest in the controversy between the complainants and the defendant who held this sheriff's deed. But this argument confounds interests in property with controversies. When this suit was commenced the defendants had different interests in the real estate which they had attached. One of them had a sheriff's deed of certain lots on which Jeoffroy and some of the other attaching creditors had no lien which could be successfully maintained against the title under that deed. But the controversy between the complainants and every one of the attaching creditors was, after all, one and the same. It was whether or not the general assignment in Missouri created a trust in the attached real estate in Kansas in favor of all the creditors of the assignor, which was superior in equity to the liens of the attachments. If it did, every attachment was voidable at the suit of the complainants; and, if it did not, every attachment was impregnable to their attack. Hence there was a single controversy, a single and common point of litigation in this suit, the decision of which would terminate the litigation and settle the rights of all the parties to it. And there can be no misjoinder of causes of action in equity in any bill which presents a common point of litigation which affects the entire subject-matter, and the decision of which will settle the rights of all the parties to the suit. Kelley v. Boettcher, 29 C. C. A. 14, 23, 85 Fed. 55, 64; Hayden v. Thompson, 36 U. S. App. 361, 373, 17 C. C. A. 592, 598, 71 Fed. 60, 67; Chaffin v. Hull (C. C.) 39 Fed. 887; Brinkerhoff v. Brown, 6 Johns. Ch. 139; Fellows v. Fellows, 4 Cow. 682, 700, 702, 15 Am. Dec. 412; Prentice v. Storage Co., 19 U. S. App. 100, 107, 7 C. C. A. 293, 296, 58 Fed. 437, 441; Brown v. Safe Deposit Co., 128 U. S. 403, 412, 9 Sup. Ct. 127, 32 L. Ed. 468; Addison v. Walker, 4 Younge & C. Ch. 442; Parr v. Attorney General, 8 Clark & F. 409, 435; Worthy v. Johnson, 8 Ga. 236. If Jeoffroy had been a nominal party merely, his presence might have been disregarded, and the jurisdiction of the court below might have been maintained. Wormley v. Wormley, 8 Wheat, 421, 451, 5 L. Ed. 651. But he was a real party to the controversy, and its decision was as vital to the determination of his rights and those of the complainants as it was to the determination of the rights of any of the other attaching creditors and those of the complainants. It may be that the complainants could have reached the merits of a suit in the circuit court against a single attaching cred-

itor, and it is undoubtedly true that they could have accomplished this end by omitting Jeoffroy from their list of defendants, and alleging that his joinder would oust the jurisdiction of the court. 5 Stat. 321; Shields v. Barrow, 17 How. 130, 15 L. Ed. 158. But they did not pursue this course. There was a real controversy between them and this citizen of the territory of Oklahoma. They brought a suit against him which involved this controversy. They joined other parties (with whom they had the same controversy) with him as defendants. He still remained, however, a real and a proper party to the suit; and the presence of a proper party to a suit involving a real controversy between him and the opposing parties, over which the federal court has no jurisdiction, is as fatal to the power of that court to hear and determine the issues which the suit involves as the presence of an indispensable party under similar circumstances. Pittsburg, C. & St. L. R. Co. v. Baltimore & O. R. Co., 10 C. C. A. 20, 27, 28, 61 Fed. 705, 711, 712.

Counsel challenge the fact that Jeoffroy was a party to the suit when the decree was rendered. They insist that jurisdiction should be presumed, and that the fact that the bill was repeatedly amended without naming him as a defendant raises the presumption that he was dismissed from the suit before the entry of the decree. When the judgment of a federal court is attacked collaterally, the presumption of jurisdiction, as well as every other presumption which upholds the judgments of courts of general jurisdiction, accompanies it. Evers v. Watson, 156 U. S. 527, 531–533, 15 Sup. Ct. 430, 39 L. Ed. 520. But it is not so when the judgment or decree is directly assailed by a writ of error or an appeal to review it. In that case the burden is on him who would sustain it to show from the record that the court below had jurisdiction of the subject-matter of, and the parties to, the litigation. And where the jurisdiction of the circuit court depends upon diversity of citizenship, it fails, unless the necessary citizenship affirmatively appears in the record. Grace v. Insurance Co., 109 U. S. 278, 283, 3 Sup. Ct. 207, 27 L. Ed. 932; Robertson v. Cease, 97 U. S. 646, 24 L. Ed. 1057; Railroad Co. v. Swan, 111 U. S. 379, 382, 4 Sup. Ct. 510, 28 L. Ed. 462. It may be that in the absence of other evidence a presumption that a defendant was dismissed from the suit before the decree was rendered arises from the filing of an amended bill without again naming him as a defendant. Hicklin v. Marco, 56 Fed. 549, 555, 6 C. C. A. 10, 16. But there is no room for any such presumption in this case, because the facts that Jeoffroy was made a party defendant to this suit by the complainants, that he appeared and answered the bill, and that the question of his citizenship was one of the issues in the case are conclusively established by the record; and there is no evidence that he was ever dismissed, or that any attempt was ever made to dismiss him, from the suit before the appeal to this court was perfected. There was an averment in the bill that Jeoffroy was a citizen of Kansas. He answered that he was not a citizen of Kansas, but that he was a citizen of the territory of Oklahoma. The complainants thereupon stipulated that Jeoffroy was at the commencement of the suit, and continued to be, a citizen, resident, and inhabitant of the territory of Oklahoma, and upon this stipulation the case went

to final hearing and decree. Now, in the face of this conclusive proof the only evidence which complainants have to offer to establish a dismissal of Jeoffroy before the decree was rendered is that in some of the amendments to their bill which they were permitted to interpose after the stipulation was made, and before the decree was entered, they used the term "et al." in the title of the cause to represent all the parties to it except the plaintiff and the defendant who were first named in the original bill. However desirable it may be to sustain the jurisdiction of the court below, and to avoid the delay and expense of another trial of the issues presented in this case, there is no escape from the established fact that Jeoffroy, a citizen of a territory, was an actual and proper party to this suit when it was commenced and when the decree was rendered, or from the resultant conclusion that on account of this fact the circuit court never had any jurisdiction of this case, without an utter disregard of the uncontradicted evidence, or a defiant violation of an indisputable principle of law. The result is that the decree below was rendered by a court which had no jurisdiction of the suit, and it cannot be sustained.

Counsel for the complainants did not fail to foresee the possibility of this result, and, with a prudence and prescience that would have been admirable if they had been early, they have, since the appeal was taken, procured an assignment of the claim of Jeoffroy to Edward C. Wright, and have moved this court, on behalf of Wright and of the complainants, to amend the record by dismissing the case as to Jeoffroy. It is earnestly contended that inasmuch as the complainants might have dismissed as to Jeoffroy, and in that way have saved the jurisdiction of the circuit court, at any time before the decree was rendered (Sioux City Terminal R. & Warehouse Co. v. Trust Co. of North America, 82 Fed. 124, 128, 27 C. C. A. 73, 77), this court may either permit them to do so here, or may reverse the decree and remand the case to the circuit court, with instructions to that court to permit the dismissal and to reinstate the decree against the remaining defendants. An appellate court has no power to allow such an amendment, but in cases in which there has been no issue regarding citizenship in the court below, and through the mistake or inadvertence of one of the parties the requisite averments have not been made, it may reverse and remand the case, with leave to the court below to permit their insertion in the proper pleading by an amendment. Insurance Co. v. Rhoads, 119 U. S. 237, 240, 7 Sup. Ct. 193, 30 L. Ed. 380; Morgan v. Gay, 19 Wall. 81, 83, 22 L. Ed. 100; Robertson v. Cease, 97 U. S. 646, 651, 24 L. Ed. 1057; Railway Co. v. Newcom, 6 C. C. A. 172, 173, 56 Fed. 951, 952; Railroad Co. v. Nichols, 29 C. C. A. 464, 85 Fed. 869. The suit in hand is not a case of this class. There was no mistake or inadvertence in the pleading or proof; no lack of an issue regarding citizenship. The issue of the citizenship of Jeoffroy was squarely presented by the pleadings. It was settled by the stipulation of the parties, and the issue of law which it presented was necessarily decided by the court when it entered the decree. On the record at the final hearing below, therefore, the defendants were entitled to a decree dismissing the bill for want of jurisdiction upon an issue of fact that had been settled by the stipulation of the parties. On that record

116 F.—11

the defendants are entitled in this court to a reversal of the decree against them, and to a direction to the court below to dismiss the bill because it had no jurisdiction of the controversy in, or of the parties to, the suit. It does not seem probable that this court has the power to permit the complainants to withdraw at this late day the issue on which they have been defeated, and to make a new and different case, of which the circuit court may acquire jurisdiction. But the gravity of the case, and the obvious importance to all the parties to this suit of reaching an end to this litigation, plead with great force for the exercise of this power if it exists, while, on the other hand, it is certain that it should not be exerted unless the complainants have clearly established their right to a decree on the merits of this case, as well as the further fact that they have been guilty of no unreasonable delay in presenting their application to dismiss the troublesome defendant, and to make a new case, of which the circuit court may obtain jurisdiction. In view of this state of the case, and to the end that, if possible, a just and speedy conclusion of this controversy may be reached, it has been thought wise to examine the equitable rights of the respective parties to this suit in the land which is the subject of the controversy, as this record discloses them, and to state the conclusion of this court regarding them, and the reasons which control its opinion.

The property in dispute consists of about 300 lots in Kansas City, in the state of Kansas. The time when the rights of the respective parties to this suit in this property became fixed was between July 9, 1893, and August 12, 1893. During this time the Corbin Investment Company, a corporation, was the owner of 185 of the lots, and the title to them was of record in its name. Nearly all the remaining lots were owned by the Realty Investment Company, another corporation, and the title to them stood of record in its name, subject to a mortgage for about $10,000 to the Kansas City Safe Deposit & Savings Bank, a corporation. This bank owned the stock of the other two corporations. On July 10, 1893, the bank, which was organized under the laws of the state of Missouri, made a general assignment, under and in accordance with the laws of that state, to two assignees, who subsequently resigned their trust and were succeeded by Howard M. Holden, one of the defendants in this suit. Between August 5, 1893, and August 12, 1893, the defendant Archie E. Watson and 51 other creditors of the bank, with knowledge of the previous assignment, attached the lots in the state of Kansas as the real estate of the bank, on the ground that the bank was not a resident of that state. On April 27, 1898, the complainants Frederick G. Bonfils and three other creditors of the bank exhibited this bill in equity to avoid the attachments, and subject the lots in Kansas to a sale and disposition for the benefit of all the creditors of the bank, on the theory that the general assignment of July 10, 1893, created a trust in this property in favor of all the creditors, which was superior in equity to the liens by attachment which the defendants had fastened upon them at law under the statutes of Kansas. The ultimate question in the case is, did the general assignment create any such trust that was superior in equity to the legal liens of the attachments?

Many and various have been the proceedings in and out of court

relating to the claims of these parties since August, 1893. These proceedings have been examined. They contain nothing which has avoided or weakened the rights acquired in that month by the defendants through the levy of their attachments.

In a suit in one of the courts of the state of Kansas, Howard M. Holden, who had been appointed successor of the assignees of the bank by a court of Missouri, procured a decree by default against the Realty Investment Company and the Corbin Investment Company to the effect that they held the title to the lots in controversy in trust for him; but that decree expressly provided that nothing therein should determine any issues between Holden and the attaching creditors, and the supreme court of Kansas subsequently held in the same suit that Holden had no legal or equitable interest in the property as against those creditors. Watson v. Holden, 58 Kan. 657, 50 Pac. 883.

Under section 532 of the Civil Code of Kansas (section 4631, Gen. St. Kan. 1889), a stranger to an attachment suit, whose property is levied upon as that of the defendant therein, may lawfully appear in that action and obtain a discharge of the property from the attachment, by a motion, on the ground that he is, and the defendant is not, the owner of it. Long v. Murphy, 27 Kan. 375, 381; Boot & Shoe Co. v. August, 51 Kan. 53, 57, 32 Pac. 635. The Realty Company and the Corbin Company appeared in the various actions in the court of Kansas brought by the attaching creditors, and moved that court to discharge the attachments on the lots which stood in their names, respectively, on the ground that they were the respective owners thereof, and that the bank had no attachable interest therein, and that court denied their motions. While this decision does not render the question it determined res adjudicata (Watson v. Jackson, 24 Kan. 442; Sponenbarger v. Lemert, 23 Kan. 55), it was a judicial determination of a question of which that court had jurisdiction; and it is not only a persuasive decision of the question of law there involved, but it brings with it the presumption that, if there was any state of facts which would have warranted that decision, proof of that state of facts was made at the hearing of the motions. King v. McAndrews, 50 C. C. A. 29, 111 Fed. 860, 866. The attachments, therefore, come to this court sustained by the conceded fact that they were issued on a lawful ground under the statutes of Kansas, and by the decision of the court of Kansas which issued them, in a judicial controversy before it between the attaching creditors and the two corporations that had the legal title to the lots,—a controversy of which that court had jurisdiction, and which the law required it to decide,—that the bank had an attachable interest in the lots when the attachments were levied. The contention of the complainants is that this conclusion was erroneous, because the bank had conveyed the property away by the general assignment, and had created a trust in it for the benefit of all the creditors of the bank before the attachments were made, so that no attachable interest remained in the bank. Do the facts of the case sustain this position?

Some time in or prior to the year 1891 the bank devised the scheme of running the title to real estate upon which it foreclosed mortgages into the Realty Company, and of taking from it notes secured by mort-

gages upon this real property to the amount that the former mortgagors of it owed the bank. The net result of the execution of this plan was that when the bank failed, in July, 1893, the Realty Company owed it $330,000, a large part of which was partially secured by mortgages on real estate which it owned, and it was insolvent. The bank, however, carried these notes and the stock of the Realty Company, which amounted to $100,000, among its assets at their par value. On September 25, 1891, the bank recovered a judgment in foreclosure against the lots in question in this suit for $90,445. Pursuant to the scheme which has been described, it ran the title to this real estate into the Realty Company at the sale under this foreclosure in May, 1892, by means of bids at the sale, sheriff's deeds, and conveyances from those who had received them; and the Realty Company gave its notes and a mortgage on this property to the bank for $81,000, the amount still due from the former mortgagor, although the lots were not worth more than $63,000. In May, 1893, the bank caused the Corbin Investment Company to be organized, took its stock of the par value of $100,000, and gave it credit on the books of the bank to that amount. Thereupon at the request of the bank the Realty Company conveyed 185 of the lots in controversy to the Corbin Company. The Corbin Company checked $79,000 of its credit over to the Realty Company, and the bank released the 185 lots from the lien of its mortgage, and credited the check for $79,-000 which the Realty Company turned over to it on the latter's mortgage for $81,000, thereby reducing the debt secured by it to about $10,000.

If the bank had been free from debt and from the intention to contract debts, there was nothing in all this which it might not lawfully have done. There was nothing illegal or immoral in the transactions between the bank and the Realty Company and the Corbin Company, as long as they alone were considered. It was perfectly competent for the bank to cause its equitable interest in this property to be conveyed to the Realty Company, and to take the latter's notes and mortgage for $81,000 therefor, and that transaction vested in the Realty Company an impregnable title to the land, and in the bank a perfect title to the notes and mortgage, as between themselves. In the same way the conveyance of the 185 lots by the Realty Company to the Corbin Company was unassailable by either of the three parties to it, because each obtained for that with which it parted the consideration it agreed to accept. The Corbin Company delivered its stock to the bank for an agreed credit of $100,000. The Realty Company conveyed the lots for a check for $79,000 against this credit, and the bank credited $79,000 on the notes and mortgage of the Realty Company in consideration of the assignment of this check. There was no fraud, deceit, misrepresentation, or misunderstanding concerning these transactions between these three parties; and the title to the 185 lots in the Corbin Company and to the remaining lots in the Realty Company was vested thereby, and made impregnable to attack by either of them.

But these transactions take on a different hue when viewed from the standpoint of a creditor of the bank. In 1891 and 1892, after the judgment of foreclosure was rendered, and before the sale under it, the

bank was the actual and the apparent owner of an equitable interest in this property equal in value to the worth of the land. That interest was subject to attachment and execution under the laws of Kansas. Shanks v. Simon, 57 Kan. 385, 391, 46 Pac. 774; Watson v. Holden, 58 Kan. 657, 661, 50 Pac. 883. Every conveyance of lands made with intent to hinder, delay, or defraud creditors is voidable at their election (1 Gen. St. Kan. 1889, § 3162), and the fact that sheriff's deeds or other legal instruments are used to perpetrate the fraud is no bar to a redress of the injury it inflicts (Decker v. Decker, 108 N. Y. 128, 15 N. E. 307). Now, while the scheme pursuant to which the title to these lots was vested in the Realty Company was legitimate and innocent so long as the three corporations alone were considered, it was a patent fraud upon both the existing and the subsequent creditors of the bank. It was so contrived as to defraud them in two ways: In the first place, it tended to induce parties to become and to continue creditors of the bank by making it appear to them that the bank had bills receivable to the amount of over $300,000, which really had none of the valuable attributes of bills receivable, but simply represented the right of the bank to procure title to real estate of far less value by foreclosure. Carrying the worthless stock of the Realty Company among the assets of the bank at par had a like effect, and this act throws a strong light on the intent which inspired the scheme. In the second place, it ran the equitable interest of the bank in the real estate subject to its foreclosures, which was open to the levies of its creditors, and which it was its right and its duty to turn into a legal title in itself, so that it would continue to be subject to their executions, into a third party, subject to a mortgage to itself, so that a creditor must avoid the conveyances and mortgages before he can realize the full benefit of his levy upon it. Why did not the bank take the title to its foreclosed real estate in its own name, refuse to take notes and mortgages upon it from third parties which really represented nothing but the right to foreclose new mortgages upon it, and tell the truth? The question is susceptible of but one true answer. It was because such a course would have prevented people from becoming or continuing its creditors, and would have subjected its land to the immediate payment of its debts. The inevitable effect of the scheme which the bank concocted and practiced was to deceive and defraud both the creditors which it then had, and those which it subsequently procured. The legal presumption is that it intended the necessary consequences of its acts. This presumption is strengthened by the evidence which has been reviewed, and by more which points to the same conclusion, which we shall not stop to recite, until no doubt is left that the title to this property was vested in the Realty Company in the operation of a plan, and with the intent to deceive, hinder, and defraud the existing and subsequent creditors of the bank; and that is the conclusion of this court. The Realty Company, which acquired this title, and the Corbin Company, which succeeded to it, were aware of this scheme and purpose, and participated in their execution. The result is that the sheriff's deeds and conveyances by which the equitable interest of the bank was transferred to the Realty Company, and the subsequent conveyance of the 185 lots to the Corbin Company, were voidable at

the election of the creditors of the bank, and that equitable interest was attachable and leviable at their suit, because the conveyances by which it passed from the bank to the other corporations were voidable for fraud in the face of their attachments.

In reaching this conclusion, the objection of counsel for the complainants that the fraud of the bank was not sufficiently pleaded by the defendants to permit its consideration has received attention. But it must be overruled, because the answers contain ample notice that this fraud would be relied upon by the defendants, because many of the facts which disclose it were stipulated into the record, and because in the pursuit of this inquiry (an inquiry whether or not this court should exercise its discretion to permit the complainants to mend their hold) the salient facts which have been reviewed, and which go so far to show the merits of the defense, ought not to be ignored.

The real estate was therefore attachable in August, 1893, because the conveyances by which the interest of the bank had passed to the two realty companies, though valid between them, were void for fraud as against attaching creditors. The defendant creditors availed themselves of this fact and attached the property. Now, where is the superior equity of the complainants and of the other contract creditors, who made no attachments and took no steps to avoid these conveyances until they brought this suit in 1898? They say that the general assignment of July 10, 1893, created a trust in their favor prior and superior to the attachments. In discussing this contention, it will be conceded that the complainants have all the rights, and that they may avail themselves of all the equities, which vested in the original assignees. On July 10, 1893, when this assignment was made, the title to these lots had been vested in the Realty Company and the Corbin Investment Company by conveyances which the bank had caused to be made for considerations which it had agreed to accept, and which it had received, and that title and those conveyances were valid and unassailable by either of those corporations. The realty companies owned the lots, and the bank owned their stock, and the notes of one of them for about $10,000, secured by a mortgage on some of the lots. The bank made an assignment of all of its property. What did that assignment convey? The answer does not seem difficult. It conveyed the stock of the corporations, the notes, and the mortgage; but it did not convey the real estate, or any other interest in it than that evidenced by the notes, the mortgage, and the stock. Suppose the two realty companies had made an assignment of all their property to another assignee at the same time that the assignment was made by the bank; the assignee of the latter companies would certainly have taken the lots, and the assignees of the bank would not, because the title to them was in those companies, and they alone could convey it. The fact that the bank alone assigned cannot change the result. It did not have, and therefore it could not and did not convey, the lots, or any interest in them that was not evidenced by the stock, the notes, and the mortgage which it held.

It is conceded that the bank caused the two realty corporations to be organized for the purpose of handling its real estate through them, that it placed the title to it in their names, and that it was practically

the sole creditor and the sole stockholder of the two corporations. In view of these facts, counsel for the complainants persistently urge that the real estate was held by the two companies in trust for the bank, that the bank was the equitable owner of the land, and that its assignment conveyed this equitable ownership in trust for its creditors. The two corporations did undoubtedly hold the title to the land in trust for the bank, and the bank was in equity the owner of it; but how did they hold it in trust, and what were the terms that conditioned the equitable ownership of the bank? They held the land and its title in trust for the bank on the same terms and subject to the same rules of law that every corporation holds its property in trust for its creditors and stockholders, and on no other terms; and the bank had the same equitable ownership in this real estate that the creditors and stockholders of any corporation have in its property, and no other. The evidence in this record is conclusive that these corporations agreed that the terms of the trust on which the two realty companies should hold the land for the bank were the terms which conditioned the legal relation of a corporation to its creditors and stockholders, and that they executed that agreement by issuing and delivering to the bank the notes and stock of the corporations, and by establishing between them and the bank the legal relation of corporations to their creditor and stockholder. There is no evidence that these corporations ever consented or agreed that the land should be held on any other terms or subject to any other trust, and, as the law and the relation of the two realty companies to their stockholder and creditor which these corporations purposely established make the terms of the trust on which it was held express and definite, no implied trust contradicting or varying those terms could have arisen. Where competent parties advisedly agree upon and express the terms of a trust on which property shall be held by some of them, and title to the property is changed accordingly, they are thereby estopped from claiming that an implied trust on different terms arose from the transaction, and as between them no such trust can be inferred.

Nor could the bank disregard or ignore the existence of these realty corporations, and convey their title to this land. It is one thing to create a corporation, and another to dissolve it. It is one thing to vest title to property in a corporation. It is another to devest it. Any one may deed land to a corporation, but no one but the corporation can reconvey it. At the time this assignment was made the title to these lots was in the realty corporations. The bank had no title to them, and no equitable interest in them, except that of a creditor and a stockholder of the corporations that held them. Its deed could not convey and its mortgage could not incumber the title to this land. The corporations which held it were existing entities, as distinct and separate from their stockholder and creditor as is one individual from another. They, and they alone, had the power to sell, convey, mortgage, and deal with the lots they held. The charters of the corporations and the law of the land denied their stockholder and creditor this privilege. The limit of its power was to convey the notes and the stock of the corporations which it owned. Insurance Co. v. Bohn, 12 C. C. A. 531, 535, 65 Fed. 165, 169, 27 L. R. A. 614; Cook, Stocks

& S. § 663a; Bank v. Allen, 90 Fed. 545, 559, 560, 33 C. C. A. 169. 175, 176; Riggs v. Insurance Co., 125 N. Y. 7, 25 N. E. 1058, 10 L. R. A. 684, 21 Am. St. Rep. 716; Van Allen v. Assessors, 3 Wall. 573, 18 L. Ed. 229; McCormick v. Insurance Co., 66 Cal. 361, 5 Pac. 617; Phillips v. Insurance Co., 20 Ohio, 174, 184.

The assignment under which complainants assert their alleged equity was made in the state of Missouri, in accordance with the laws of that state. The stream cannot rise higher than its source, and this assignment vested no better title in, and granted no greater power or rights to, the assignees in the state of Kansas than it gave them in the state of Missouri, pursuant to whose laws it was executed. Limekiller v. Railroad Co., 33 Kan. 83, 89, 5 Pac. 401, 52 Am. Rep. 523. An assignment at common law and under the statutes of Missouri does not vest in the assignee the rights of creditors to avoid the fraudulent conveyances of the grantor. It conveys for the purpose of the trust what the assignor has, only, but nothing which he has transferred or caused to be transferred to others by conveyances that are good against him, but fraudulent as to his creditors. Harris v. Harris, 25 Mo. App. 496, 502; Roan v. Winn, 93 Mo. 503, 511, 4 S. W. 736.

The sum of the whole matter is that the equitable interest which the bank held in these lots in 1891 had in July and August, 1893, been vested in the Realty Company and the Corbin Company by conveyances and transactions which were good against the bank and its assignees (Zoll v. Soper, 75 Mo. 460; Jackman v. Robinson, 64 Mo. 289; Merry v. Fremon, 44 Mo. 518; Harris v. Harris, 25 Mo. App. 496; Roan v. Winn, 93 Mo. 503, 4 S. W. 736), but which were voidable for fraud at the election of the creditors of the bank. The assignment did not convey this equitable interest to the assignees through whom complainants assert their supposed equity, because the bank had already caused it to be transferred to the two realty companies. The conveyances to these realty companies were voidable, not void. They were impregnable to attack by either of the three corporations. They were valid as to all the creditors of the bank who did not seasonably elect and act to avoid them, but they were voidable for fraud by those who did so elect and act. Johnson v. Trust Co., 43 C. C. A. 458, 461, 104 Fed. 174, 177. The attaching creditors elected to avoid them, and to fasten their liens upon this equitable interest of the bank in August, 1893. The complainants have failed to convince that they have any equity superior to these lawful liens, for two reasons: In the first place, they have no greater rights or power than the original assignees, and the original assignees had no greater rights or power than the bank. None of them ever had any right or power to avoid the fraudulent conveyances, and the attachments were as valid against the assignees and these complainants as they would have been against the bank if it had never made an assignment. In the second place, the fraudulent conveyances were not void, but voidable at the election of each creditor. The attaching creditors elected to avoid them, and fastened their liens upon the property in July, 1893. After they had succeeded through a fierce litigation, that is still protracted, and about five years after the attachments were levied, the complainants disclosed their election, by filing this bill, to share in the proceeds of the property

which the attaching creditors had seized and held during all this time. Laches raises no equity superior to that which diligence creates.

Many proceedings are portrayed in the record in this case, and many questions of law have been discussed in the briefs of counsel, to which no reference has been made.   They have all been examined, but there is nothing in any of them which, in our opinion, will ever lead to a different result from that at which we have arrived.   Reference has been made to the salient facts and the controlling rules of law which must ultimately measure the rights of these parties, and, as there is no equity in the bill of the complainants, their application for leave to dismiss in the court below as to the defendant Jeoffroy, and to amend their record so that the circuit court may acquire jurisdiction, must be denied, and the bill must be dismissed.

The decree below is accordingly reversed, the case is remanded to the circuit court, with directions to dismiss the bill for want of jurisdiction, and to make such orders and take such proceedings as will, as far as practicable, restore to the attaching creditors all property which they have been prevented from receiving or have been deprived of by the proceedings of that court or its officers in this suit.   And it is so ordered.

CALDWELL, Circuit Judge (dissenting).   The supreme court of the United States has divided parties, for purposes of jurisdiction in the federal courts, into formal, necessary, and indispensable.   Shields v. Barrow, 17 How. 130, 15 L. Ed. 158; Alexander v. Horner, 1 McCrary, 634, Fed. Cas. No. 169.   As these terms are defined by that court, Jeoffroy, the citizen of Oklahoma territory, was not an indispensable party in this case, and he might have been dismissed out of the suit, and the court would have had jurisdiction of the remaining parties and the subject-matter.   It was error to proceed to a final decree while he remained a party to the record.   But when it is made to appear, and is not disputed, that he no longer has any interest in the subject-matter, enters a disclaimer, and asks to be dismissed out of the suit, and the plaintiffs in the suit join in that motion, this court ought to grant the motion, or disregard the technical error and proceed to a decision of the cause on its merits.   The cause ought not be reversed and remanded for that now mere formal error, and the parties be compelled to bring the case here a second time for a decision on its merits.   On the merits, the bill ought to be dismissed for want of equity.